## Case No. 11,270.

POOLE et al. v. NIXON et al.

[9 Pet. Append. 770.] [1]

Circuit Court, E. D. Pennsylvania.   Oct. Term, 1834.

EQUITY PRACTICE—BILL OF REVIEW—WHEN ALLOWED—AFFIDAVITS—NEWLY DISCOVERED EVIDENCE—NEW MATTER—IN WHOSE FAVOR—REHEARING — PENDING APPEAL — REVERSING DECREE OF SUPREME COURT.

[1. Bills of review are an anomaly in the system of jurisprudence prevailing in England and the United States. Cognizance of them rests entirely on Lord Bacon's order by which they were first allowed, and the practice founded thereon. They are not favored, and the party applying for leave to file such a bill must not only perform, or give security for the performance of, the decree sought to be enjoined, but must support his application with a strong affidavit, showing that the new matter upon which the review is sought was not known to the party or his solicitor, and could not have been ascertained, at the time of the original decree.]

[2. The common affidavit to original bills cannot be received in such a case, but the affidavits must contain the averment, not only of the party, but of all other persons whose negligence may be imputable to him, that they could not possibly have secured the evidence claimed to be new at the hearing or before the decree.]

---

[1] [Reported by Richard Peters, Jr., Esq.]

[3. One J. petitioned for leave to file a bill of review, claiming to have new evidence upon a question of pedigree, which was the decisive question in the original suit, which evidence would suffice to alter such decree. It appeared that the facts upon such question which the new evidence tended to prove were all within the knowledge of the petitioner long before the rendition of the decree; that the most trustworthy evidence of such facts was accessible to the petitioner in the parish registers in England, where it should and could have been found, and that the new evidence consisted of memoranda and family records of a deceased person, confirmatory of the evidence of such registers, which memoranda and records were also insufficient, of themselves, to prove all the facts necessary to establish the petitioner's claim. *Held*, that no case was made out for a bill of review.]

[4. An entirely new title, in a new party, claiming adversely to all the original parties to a suit in which a title was established, cannot be considered newly-discovered matter, for the purpose of opening the decree in such suit by a bill of review.]

[5. A bill of review lies only in favor of a party or privy to the original suit, or of one who is aggrieved by the decree. Accordingly, where a decree had been rendered in favor of one W., as devisee of M., upon a finding that he was the heir of M., *held* that one J., not a party to the original suit, who claimed to be the true heir of M., and so entitled to the devise, was not entitled to file a bill of review.]

[6. A court of equity has no power to order a rehearing of a cause after the close of the term at which a final decree therein is rendered, but thereafter new parties and new matter can be introduced, as a ground for a prayer for revision and reversal of the decree, only by a bill of review.]

[7. A circuit court of the United States has cognizance of a bill of review, after an appeal to the supreme court from the decree sought to be reviewed, if it is brought on newly-discovered evidence of facts, though not if it is for error apparent in the body of the decree, and may permit such a bill to be filed as an amendment by adding new matter and parties to the original record.]

[8. Whether, on such a bill filed, the circuit court can reverse, for error in fact, a decree affirmed by the supreme court, quære.]

On a motion for leave to file a bill of review.

BALDWIN, Circuit Justice. To the April term of this court, in 1828, a suit in equity was brought by Samuel Packer against Henry Nixon, executor of the last will of Matthias Aspden, to recover the balance of the estate remaining in his hands unadministered; in the progress of the suit, other parties were added as complainants, among whom was John Aspden of Lancashire, England. He claimed as heir at law to the testator, by descent from William Aspden, whom he alleged to be the eldest uncle of the testator. On a reference to the master, he reported the said John Aspden to be the heir at law; which report, on exceptions taken, was confirmed by this court in May, 1832. In December, 1833, the cause came on to a final hearing, when a final decree was pronounced in favor of John Aspden, and the bill was dismissed as to all the other complainants; from this decree an appeal

was taken to the supreme court at January term, last, which is now depending. On the 17th June, last, Jennet Jones, and Thomas Poole and Mary, his wife, filed their petition, setting forth that the said Jennet and Mary are the heirs at law of the testator, by lineal descent from John Aspden, the eldest uncle of the testator, and as such pray to be made parties to the original suit. They also ask leave to file their supplemental bill, and bill of review to reverse the decree so far as it declares John Aspden of Lancashire to be the heir at law of the testator, and directs the executor to pay him the balance of the estate. This is an application to the discretion of the court to allow an amendment, introducing new parties and new matter into a suit closed by a final decree on its merits; and, if the amendment is allowed, to revise and reconsider the decree as it may be affected by evidence offered by the new parties. If the amendment is refused, the petitioners are precluded from the benefit of a bill of review, however much the decree may affect their rights; on the other hand, if it is once allowed, the respondents must plead, demur, or answer to the new matter as if it were set out in an original bill (Dexter v. Arnold [Case No. 3,856]; 1 Vern. 418; Mitf. Eq. Pl. 236; 2 Madd. 543), or disprove it (Beames, Eq. Pl. 314).

The preliminary question, whether the bill shall be filed, is therefore an important one in all cases, and in some the only one; for the new matter may be of the most conclusive effect, if once it is introduced into the cause, and its truth admitted or made out in proof. In this case it is especially important to examine it in all its bearings, as well from the novelty of such applications in the courts of the United States, as the peculiar situations of the parties, and the cause which it is sought by the bill now offered to review and re-examine on its merits; and as they involve principles highly interesting to suitors, the profession, and the public, without taking into consideration the magnitude of the sum in controversy.

Bills of review in courts of equity are an anomaly in the system of jurisprudence which prevails in England and this country; no principle is better settled, or of more universal application, than that no court can reverse or annul its own decrees or judgment for errors in law or fact, after the term in which they are rendered, unless they have been entered by mistake of the clerk. Medford v. Dorsey [Case No. 9,389]; The Palmyra, 12 Wheat. [25 U. S.] 10; [Cameron v. M'Roberts] 3 Wheat. [16 U. S.] 591. The supreme court of the United States cannot reverse its own decisions [Martin v. Hunter] 1 Wheat. [14 U. S.] 355. They are conclusive on the rights of the parties. Same point [Cohens v. Virginia] 6 Wheat. [19 U. S.] 387. And so are the judgments of inferior courts while they remain unreversed. Courts of common law can reverse their

judgments only in one case. A writ of error coram vobis lies on an error in fact; but for an error in law they cannot reverse their own proceedings, nor can they grant a new trial on newly-discovered evidence after final judgment. A court of equity cannot reverse their decree, or rehear the cause, after a final decree enrolled; till then it is open for both purposes, but after that is done it is as a final judgment at law. Such was the rule in equity as late as 15 Jac. I., when a bill of review for a new matter was refused. Cary, R. 30. The law considers the record of a cause to be in the breast of the judges while the court is in session; they may alter or amend any entry of their proceedings during the term; but when they have made a record of their acts, and the term is closed, they become adjudicated matters, which give to the parties rights that cannot be taken from them, otherwise than by the powers of an appellate court. Judgments at common law are reviewed on writ of error as to matters of law; on matters of fact they cannot be revised by the court of error; this is not only a rule of the common law, but an express provision of the twenty-second section of the judiciary act, and of the seventh amendment of the constitution.

The question before the appellate court is, was the judgment correct; not the grounds on which the judgment professed to proceed. [M'Clung v. Silliman] 6 Wheat. [19 U. S.] 603; 4 Dow, P. C. 143. Final decrees in equity may be examined on appeal, both as to matters of law and fact; the appellate court gives such a decree as the circuit court ought to have given on the whole case. Jud. Act, § 24 [1 Stat. 85]. But bills of review differ from writs of error and appeals; the former being by the court which renders the decree, the latter by a superior tribunal. Under an appellate authority, conferred by statute or sanctioned by usage, defining the cases in which it can be exercised, if no power is given to any court to revise the proceedings of another, they become final and conclusive as to all matters adjudicated by them, whether in law, equity, or admiralty. No act of parliament has given to any court the power of taking cognizance of appeals from courts of equity, and none had assumed it before 1620, 1621. Up to 13 Jac. I., there was no precedent of even a prohibition to a court of equity in a county palatine. 1 Rolle, 246, 331. The first that issued was during the Protectorate, in 1651. 1 Rolle, Abr. 318. Nor to the stannary court in the duchy of Cornwall; an appeal lay only to the Prince of Wales, and, if there was no prince, then to the king in council. 1 Rolle. Abr. 246; 3 Bulst. 116. About this time the court of king's bench claimed the power of issuing writs of prohibition to the chancellor to prevent him from making a decree in matters cognizable at common law, or from interfering with the judgments of the courts of common law, for which Lord Coke gave

this reason: "That the rules and judgments of courts of equity are as binding as the laws of the Medes and Persians, not to be altered, upon which no writ of error lies; they therefore ought to be prohibited before judgment, or the party has no remedy" (2 Bulst. 197, 215; Cro. Jac. 335, 336), except by petition to the king (3 Bulst. 118), who might refer the matter to the judges, to reverse the decree if they should think it ought to be (4 Inst. 85, 86; 42, 43 Eliz.; 3 Bulst. 118). The reason of applying to the king was that the chancellor was his representative; sitting and judging in his name, and by his authority; his decrees were the decrees of the king, not to be altered without his leave. Gilb. Forum Rom. 185, 183. The assertion by the king's bench of the right to grant prohibitions to the chancellor, led to a controversy which brought Lord Coke to his knees before the king in council; and it was determined, after a reference by the king to Lord Bacon and others, by a declaration of the king, that he had the sole power of deciding the jurisdiction of the several courts, and ordered that "the report made to him, with his proceedings thereon, should be enrolled in chancery, there to remain of record, for the better extinguishing of the like differences and questions that may arise in future times." 1 Ch. Rep. App. 1–50; Cary, 181–183 (A. D. 1616).

From this time there was no power in any court to revise the decrees of the chancellor (1 Ch. Cas. 44, 45), until Lord Bacon made an order on the subject of bills of review by the chancellor himself; but there was no appeal from his decision on a bill of review, or any other subject, until the house of lords, in 1620, 1621, sustained an appeal from a decree of Lord Bacon (3 Journal of the House of Lords, 50, 61–63, 67, 76, 78). This was held by the commons to be a novelty, and was resisted from time to time up to 1704. 3 Bl. Comm. 454; 1 Deb. House of Commons, 210, 240; 3 Deb. House of Commons, 302, 308. Since which time it has been at rest; "it has been submitted to, because it has been thought too much that the chancellor should bind all the property in the kingdom without appeal (Gilb. Forum Rom. 190, 191); and it is reasonable to have the examination of their sentences in the parliament, as well as of judgments at common law" (Show. Parl. Cas. 81).

The cognizance of bills of review rests entirely on the order of Lord Bacon; but, as it has been acquiesced in and acted on from the time of its adoption, it forms a part of the law of equity which has been adopted by the constitution of the United States as applicable to all cases in equity within the jurisdiction of the courts of the United States. [Parsons v. Bedford] 3 Pet. [28 U. S.] 446. This order is to be considered as an act of parliament or of congress, conferring on courts of equity a new power, which must be exercised conformably

to its provisions, and, being in derogation of the principles of the common law, must be construed strictly, so as to confine its application to the specified cases. When such a case arises as is proper for a bill of review, the final decree of the court of equity becomes the subject of appeal to the supreme court, in the same manner as a decree on an original bill; but no appeal lies upon any order or interlocutory decree; it is confined to those decrees which decide finally on the rights of the parties before the court. Jud. Act, § 22.

The present application is for an order to amend the proceedings in the original suit, the refusal or making of which is a proper ground for appeal in England (3 Atk. 34; 4 B. P. C. 465, 486; Gilb. Forum Rom. 188, 189), but not here, because it is not a final decree, and because it is a matter purely in the discretion of the court, with which the supreme court do not interfere in ordinary cases on questions of amendment ([Mandeville v. Wilson] 5 Cranch [9 U. S.] 15; [Walden v. Craig] 9 Wheat. [22 U. S.] 576; Chirac v. Reinicker] 11 Wheat. [24 U. S.] 302). The same rule applies to that part of the petition which prays to have the decree opened for revision on the new matter alleged, being in the notion of an application to a court of law for a new trial. [Barr v. Gratz] 4 Wheat. [17 U. S.] 220; [U. S. v. Buford] 3 Pet. [28 U. S.] 31, 32. The supreme court never give directions respecting amendments, but leave that question to the court below. [Skillern v. May] 6 Cranch [10 U. S.] 267. They will reverse a decree for the want of proper parties; but in such case "remand the cause for farther proceedings according to law and justice." [Ex parte Watkins] 3 Pet. [28 U. S.] 204.

Bills of review are not favored in equity. If they are founded on the discovery of new matter, the petitioner must make a deposit to cover the costs of the application. 2 Atk. 139. And the bill must be filed with the special leave of the court. Id. 139; Dickens, 612, 614, 616; Mitf. Eq. Pl. 71; 2 Ves. Sr. 598; 1 Johns. Ch. 490, 491. Though, if the bill is filed without leave or deposit made, the court will give leave to make it, and have it considered as made before the bill filed. Dickens, 223. The party praying for the bill of review must perform the decree; if for money, he must pay it; if to convey land, he must give up possession. Toth. 42; 2 Eq. Cas. Abr. 175, 176, pl. 13, note. But, if the act decreed to be done will extinguish the party's right, its performance will be spared till the bill of review is determined, but the sparing must be by the order of the court. Toth. Append. 41–47; 2 Har. Ch. 126; 1 Vern. 117, 264; Pr. Reg. 52; Bohun, 382; Gilb. Forum Rom. 185, 187; 2 B. P. C. 24, note; 2 Freem. 88. Or, if the party is unable to perform the decree, he must give good security or be committed (1 Ch. Cas. 42; Mitf. Eq. Pl. 70; 2 Johns. Ch. 491; 3 Johns. Ch. 128); unless he is an executor, who may have a review without performance (2 Eq. Cas. Abr. 175; 12 Mod. 343). The reason of imposing these conditions is obvious; "there is wisdom in the establishment of such a provision, and it ought to be duly enforced; the object is to prevent abuse in the administration of justice by filing bills of review for delay and vexation, or otherwise protracting litigation to the discouragement and distress of the adverse party." 2 Johns. Ch. 491. These rules form a part of the law of equity on bills of review in England; subject to which, they have been introduced into the equity jurisprudence of the United States.

The party must make a strong affidavit (16 Ves. 349) that he had not any knowledge of the new matter set forth in his petition and bill of review, at the time of the hearing, or when the original decree was given; that it has since come to his knowledge; and that it could not have been produced or used then. Mitf. Eq. Pl. 66; 2 P. Wms. 284; Gilb. Forum Rom. 187. The words of Lord Bacon's order are, "which could not possibly have been used at the time of the decree passed" (Toth. Append. 41, 42), which is adopted in the form of the affidavit (1 Har. 64, 76), the most approved treatises (Pr. Reg. 51; 2 Har. Ch. 123; 3 Bl. Comm. 454), and in judicial decisions of the highest authority (3 Johns. Ch. 126; 2 Johns. Ch. 492; 2 B. P. C. 108; Bohun, Curs. Can. 381; 1 Ves. Sr. 434; 3 Atk. 37). The affidavit must be by the party, and not the solicitor (4 Vin. Abr. 415; 2 Eq. Cas. Abr. 175, 176, pl. 13), unless good reasons appear for the party not making it. The court may hear counter affidavits, or other proof in opposition (Dexter v. Arnold [Case No. 3,856]) to the affidavit of the party, to show that he had knowledge of the alleged new matter before the decree, or that he had been negligent in searching (1 Ves. Sr. 435; Mitf. Eq. Pl. 70; 3 Johns. Ch. 125; 2 Browne, Parl. Cas. 25). They require to be satisfied that the new matter was not in the knowledge of the party, his solicitor or agent (2 Atk. 534; Dickens, 612, &c.), or country attorney (3 Atk. 35); the knowledge of either being the knowledge of the party (4 B. P. C. 465, 486). The party must have used active diligence (16 Ves. 351), or a reasonable diligence to procure the evidence before the decree (2 Atk. 40; 2 Johns. Ch. 491). If negligence is imputable to him, leave will not be granted. 1 Ch. Cas. 43; 4 Vin. Abr. 409, pl. 18; Bohun, Curs. Can. 384; 2 Eq. Cas. Abr. 176; 2 Browne, Parl. Cas. 109, 110; Gilb. Forum Rom. 187; 1 Hen. & M. 15. Inattention or misjudgment is no excuse (Prevost v. Gratz [Case No. 11,406]), as if the party had the paper in a trunk in his own possession, but did not know of it in time (Prevost v. Gratz [supra]); unless they had been in a distant place, or the party had no reason to believe that they were in the trunk, &c., in which

they were found (Gilb. Forum Rom. 187, 189; 1 Ves. Sr. 435; 16 Ves. 354; 3 Johns. Ch. 127; Dexter v. Arnold [supra]). So if there was enough in the knowledge of a party or his solicitor to put them on an inquiry; if by what was before him he was sufficiently apprised to enable him to acquire complete knowledge, or enough appeared in the bill to call upon a party using reasonable diligence to bring forward the whole case; he is not allowed to file his bill. 16 Ves. 350, 354. So if the paper discovered has been found in the appropriate office, without any previous search, as in the case of a vicar's bill for tithes, it is deemed negligence not to have searched in the augmentation office. 4 Cond. Eng. Ch. 114, 115; Jac. 243. It will not avail a party that he was prevented from offering the evidence by the advice of one of his counsel in the absence of the other. 3 Munf. 112, 115.

These rules show the caution with which the courts of equity act in the first attempt to disturb an enrolled decree; they are much more rigid than in any other case, showing that a bill of review, for newly-discovered matter, is considered as an extreme remedy for extreme cases, which public policy and peace alike require to be administered with extreme care, lest the sanctity of final decrees may become of too easy or common violation. These, too, are cases in which the greatest danger exists, if not of perjury, at least of the most latitudinous oaths in the affidavits of interested parties; the court must hear them in all cases; they must act in conformity to them if they are full, clear, and not contradicted; and, when they have given leave to file the bill, the new matter becomes incorporated into the proceedings in the original cause, as it is stated in the petition and bill of review. Then the usual course is for the defendant in the bill of review to plead and set forth the original decree, and then demur to the new matter set up for opening the enrollment; the court then judge from the face of the decree whether the new matter, as admitted by the demurrer, is sufficient for its reversal. Finch, 36, 209; 2 Atk. 534; 3 Atk. 627; 1 Vern. 392; 4 Hen. & M. 24, 34. Or the defendant may take issue on the truth of the new matter set up, when the court will open the publication to receive and decide on the evidence offered; if the facts, as alleged, are then established, the court review and revise the decree upon those facts. Dexter v. Arnold [supra]. These reasons induce a court to examine particularly into all these preliminary questions; not only to avoid interminable litigation, but doing injustice to a party in whose favor their deliberate decree has been made, by suffering it to be questioned on a suspicious application, founded on alleged new matter, or when that matter, as set forth, is not clearly relevant material, and would or might have led to a different result if it had

been known and used at the hearing. Mitf. Eq. Pl. 66, 67; 1 Ves. Sr. 434; 2 Ves. Sr. 600; 3 Atk. 35, 36; 3 Johns. Ch. 127; 1 Hen. & M. 15; Dexter v. Arnold.

Few cases can arise in any court which call for more circumspection and deliberation in their every step than this; the final decree complained of was not rendered till the suit had been depending for more than five years, during which every preliminary question was contested before the master and the court, whether it was of law or fact. The case turned on two questions: First, the construction of the will of Matthias Aspden, the younger; and, next, on who was his heir at law. There were competent parties before the court, who were entitled to the fund on any construction which the court might put on the devise; an heir at law on the father's side, an heir at law on the mother's side, and the next of kin to the testator in all the ramifications of genealogy; all claiming from the executor, who was before the court with the fund in his hand, subject to their order. The heir at law on the father's side was identified in the person of John Aspden of Lancashire, England; he appeared, was made a party, and no one contested that character with him; the only controversy was as to his descent from the common ancestor, Thomas Aspden, of Simonstone, by legitimate succession. That fact was contested by the other parties before the master on the evidence before him, on an exception to his report, founded on the insufficiency of the evidence before him to prove the fact. The court deemed the evidence legally sufficient, and confirmed the report in May, 1832, from which time the question was no longer agitated; the decree assumed the fact of heirship in the person of the said John, and was founded upon it, as one not then in controversy; the only question open after the confirmation of the master's report being the construction of the will. It was not suggested to the court that there were parties in interest not before them; it was evident that the fund was fully represented by some one of the parties, for there was no character in which any one person could take under the will, which was not completely filled by some of the claimants. It was not, therefore, a case in which the court could suspend their decree for the want of parties, or one in which an appellate court could, on appeal, reverse, on that ground, a decree in favor of either description of claimants. [Russell v. Clark] 7 Cranch [11 U. S.] 87, 98.

As the counsel of the petitioners have alluded to an expression of the court in giving their opinion on the master's report and in rendering the final decree, we think it proper to observe that on the question of heirship the evidence was not so full or clear as it might have been; we gave our opinion upon it with some misgivings as to the fact of William.

Aspden being the oldest brother of the testator's father. But then we had only to judge of its legal sufficiency, of which we had not then, and have not now, a doubt that from the facts before the master the legal conclusion was inevitable. What we said in reference to a future examination of that question was not intended, and could not be understood, as referring to any other revision than was usual in courts of equity, and consistent with its rules, that is, before a final decree was pronounced. When, in delivering the opinion, we assumed, "for the present," that John Aspden, of Lancashire, was the heir at law, it could not be intended that we would allow a revision of that fact after our power over the decree had terminated by an adjournment. The obvious as well as intended meaning was that up to the time of a decree for final distribution the question might be opened; and in the act of rendering that decree we did not consider it as finally closed, so long as by the rules of law it could be kept open,—that is, during the term. On a proper case being presented, new parties might have been introduced, the publication opened, new evidence received, and the cause reheard on the question of heirship, or any other matter proper for a rehearing; but when the term had closed upon a final decree on the merits between competent parties, ordering the payment of the fund to a claimant, and dismissing the bill as to all others, it was too late for a rehearing. There was no suit depending, no cause to rehear, no fact to decide, no question of law to examine; everything which had accrued in the cause had become a res adjudicata; and, unless for the purpose of appeal, there were no parties in court except the plaintiff John Aspden, and the executor, between whom all past questions were finally adjudicated, and no new ones could arise, otherwise than on the execution of the decree. It is, then, no case for rehearing, however clear may be the justice or abstract right of the petitioners, had they asserted their claim within that time during which the court had power to decide upon it. In the intermediate time between the pronouncing and enrolling the decree in England, or between the decree and the rising of the court at the end of the term in this country, a supplemental bill in the nature of a bill of review may be filed, making new parties, and introducing new matter as the ground of a prayer for rehearing. Mitf. Eq. Pl. 71; 2 Ves. Sr. 598; 2 Johns. Ch. 490; 2 Atk. 534; Dickens, 612, 616; 17 Ves. 177, 178; 2 Atk. 40. After the decree is enrolled, or the term elapsed in which it is given, new parties or new matter can be introduced by a bill of review, as a ground for a prayer for revision and reversal of the decree. 17 Ves. 177; Dexter v. Arnold [Case No. 3.856]. The supplemental bill, in the nature of a bill of review, and the bill of review, depend on the same rules as to granting or refusing them. 17 Ves. 176; 2 Johns. Ch. 490. Their prayer must be certain and specific as to the relief prayed (2 Anstr. 551),

and not in the alternative (17 Ves. 177, 178; Dexter v. Arnold [supra]). When the petition is presented in time, it rests in the discretion of the court to allow it to be filed, in the exercise of which they will determine whether a proper case is made out (5 Mason, 315); but if the term elapses, they cannot act upon the petition, without an abuse as well as excess of jurisdiction; the court has no power to receive a supplemental bill after a final decree enrolled, nor to revise the decree in any other manner than a bill of review, or allow either to be filed, unless in the cases and for the causes specified in the rules which form the law of equity; discretion can be exercised only on the existence of the required case and cause, but on no other subject; the authority to open the decree is special, and must be pursued strictly. The chancellor must decide whether the given state of facts brings the case within the rules; but if he thinks they do not, he cannot permit the petitioner to proceed further.

This is the interesting question in the present case,—have the petitioners made out a case for a bill of review under any circumstances? If so, are those presented a sufficient cause for opening the decree? If they had done these, there is abundant reason for believing that their rights have been overlooked, and that the abstract justice and equity of their claim would have prevailed, had it been asserted in time. The evidence which is before us judicially, with that which has been known otherwise, makes out a case (till explained) of an imposing character as to original right, long neglected, and now for the first time asserted in this court. On the other hand, the case of the defendant is one not without its strong appeals, on account of the persevering efforts of years to disincumber his claim of the adversary pretensions of a host of claimants. He has hitherto been successful in establishing his right, according to all the forms and rules of law, so that it has become as perfect as the decree of this court could make it. If it shall remain unreversed, a princely fortune awaits him as the heir at law; it has been recovered by the exertions and active vigilance of the defendant, while its pursuit in this country was abandoned for two years after the death of the former owner, by the new petitioners, who first assert their claim after the defendant has removed all difficulties interposed by his former adversaries. If the prize is awarded to the petitioners, they are bound to pay no salvage; if retained by the defendant, the actual owner is entitled to no compensation for his lost right; in either event there must be abstract injustice; which, as individuals, it might appear to us to be the case of greater hardship, is not easy to say; as judges, our course is plain. With the relative claims of the two parties as they stood at the death of Matthias Aspden, we have now nothing to do, but must examine them as they were when this petition was filed; one comes before us on his original right; the other has, in addition, our final decree in favor of his; whether we have acted erroneously is not

for us to say; the cause is now out of our jurisdiction, unless it can be again brought within it by the matters set up now. Whether it can or cannot, it is not for us to look to consequences, we must follow the course prescribed by law, to ascertain, first, our power according to the rules of equity on upon this decree on the case presented; next, the sufficiency of the causes alleged for its exercise. The importance of the case, in all respects, induces us to take a view of all the points it involves, as it is desirable that the general principles which govern cases of this description should be so explained as to leave, for the future, less doubt on their application than has attended this.

As the authority of a court of chancery to review its decrees rests on the order of Lord Bacon, we must consider it as a test to which all applications are to be applied. "No decree shall be reversed, altered or explained, being once enrolled, but upon bill of review; and no bill of review shall be admitted, except it be upon error in law appearing in the body of the decree, without farther examination of matters in fact; or he shall show some new matter which hath risen in time, after the decree, and not any new proof which might have been used when the decree was made. Nevertheless, upon new proof which hath come to light since, and after the decree made, and could not possibly have been used at the time when the decree passed, a bill of review may be granted by the special license of the court, but not otherwise." Toth. Append. 41; Balt. Law Trans. 279, 280. Miscasting by an error in auditing or numbering, may be explained and reconciled by an order without bill of review. Toth. Append. 41, 42. The terms "imposed on the party" are specified as before referred to. Toth. Append 42–47. These orders have continued to be respected as the basis of equity jurisprudence till the present day (3 Atk. 35; 3 Johns. Ch., 126; 16 Ves. 350), both in England and the equity courts of the different states and of the United States (Dexter v. Arnold [supra]).

The first question in order is whether a bill of review can be filed in this court during the pendency of the cause in the supreme court by appeal. The question has never been decided in the courts of equity in England. 16 Ves. 89. In a late case on an appeal from the rolls, the chancellor decided on a petition presented for leave to file a bill of review, without adverting to its being on an appeal. 4 Cond. Ch. 114. So that we are without any direct decision on the point whether one could be filed with the master of the rolls, after an appeal to the chancellor, or before him after an appeal to the lords. Their appellate power, as we have seen, is an assumed one, from the necessity of the case; being neither conferred nor regulated by statute, it may, and has been, exercised according to the exigency of the case and the time, as either may call for the adoption of new rules or orders, which partake more of the character of legislation than the mere regulation of the forms and modes of proceeding in the practice of the courts. 4 Bridg. Eq. Dig. 50, pl. 49. Not restrained by any act of parliament, they permit or prohibit the action of courts of equity on cases appealed from, according to their discretion. By their ancient practice an appeal stayed all proceedings in the cause, and it continued—till the frequency of appeals, and their abuse, for the purposes of delay, induced the house of lords to alter it, and permit the chancellor to proceed after appeal; this was deemed indispensable, as an appeal might be taken on every order on a petition, motion, or interlocutory decree in the process of a suit in equity. 15 Ves. 184; 16 Ves. 213, 218; 18 Ves. 453; 1 Johns. Ch. 327; 3 Johns. Ch. 66, 68, 123, 162. This alteration of the practice took place, as Chancellor Kent says, in 1798. 1 Johns. Ch. 80. It is not followed in New York, where an appeal suspends proceedings on the point appealed from, but the chancellor may, in his discretion, proceed if the court of errors is not in session, or in possession of the case. 1 Johns. Ch. 81, 327; 3 Johns. Ch. 66, 68. In that state, too, that court has power to render its practice conformable to that of the house of lords, to prevent the abuse of appeals on orders and interlocutory decrees. 1 Johns. Ch. 327, 328; 3 Johns. Ch. 69, 123. And the court of chancery acts on the same principle in proceeding after appeal (3 Johns. Ch. 162, 166), not because the nature and effect of an appeal is not to suspend proceedings below in equity as a writ of error does in law, but because the exception is made from necessity. Lord Eldon says that in doing so "he acts by the authority of the lords; such is their clear understanding; as they permit the practice, it amounts to their authority." 9 Ves. 316. Chancellor Kent adopts this reason. 1 Johns. Ch. 80. It may therefore be taken as the settled practice in England and New York that an appeal does not stay proceedings, unless an order to that effect is made by the chancellor or the special order of the house of lords or court of errors, which either is competent to make; if not made, then the chancellor may proceed in the cause to its termination, when an appeal may be taken on the whole proceedings in the cause. 9 Ves. 319; 15 Ves. 184; 14 Ves. 585. "It is more expedient" (as Lord Eldon says) "to make the application to the house of lords than to the court below, as the order made upon that occasion may be the subject of appeal, and it is difficult to determine how far appeals may go" (15 Ves. 182), and if the court could not proceed after an appeal it "would make a chancery suit the greatest nuisance" (9 Ves. 318). It cannot be denied that these are powerful reasons for the prevailing practice, when the inferior and appellate courts have power to adopt it; they cannot, however, be applied to cases of appeal from the decrees of this court, which

must be final ones on all the matters in controversy between the parties, leaving nothing on which there is a power to act, except in their execution. The appeal is by a right given by a statute, of the benefits of which the party cannot be deprived, if he gives the security required by law. [Penhallow v. Doane] 3 Dall. [3 U. S.] 78. It is in the nature of an appeal or writ of error, to operate as a supersedeas ([Penhallow v. Doane] 3 Dall. [3 U. S.] 87, 118; [Taylor v. Brown] 5 Cranch [9 U. S.] 253), to the execution of the decree or judgment appealed from. The record is removed from the inferior to the superior court, leaving the former nothing to act upon. 15 Ves. 182. When the appeal or writ of error is matter of right, no terms can be imposed; if it is matter of favor or indulgence, they may be; as in appeals from the rolls to the chancellor, or rehearings, these are matters of indulgence known to no other than courts of equity; the proceedings at the rolls are not suspended except by special order, but that originates in a special order of Lord Clarendon, and is not founded on any general principle of the law of equity. 9 Ves. 317, 318.

When final judgments or decrees are removed, there is no proceeding to suspend except execution; the benefit of the appeal would therefore be lost if the court below could enforce it; hence has resulted the rule which makes them operate as a supersedeas. An appeal to the house of lords brings the cause and record before them (Gilb. Forum Rom. 190, 191), and by the ancient practice prior to 1798 stayed all proceedings in chancery (15 Ves. 184), and yet does in Scotch appeals (Id. 182). When the cause is once before the house of lords, it was necessary to obtain a special order that the respondents be at liberty to go on with the account before the master notwithstanding the appeal. 2 B. P. C. 108; M'Cartney v. Ludlow, 21 Journal House of Lords, 82. In the case of Popham v. Bampfield, the court of chancery proceeded in the account after an appeal, when the house was prorogued. 1 Vern. 344. This, however, was a special case; the appeal was made in June, 1685, and no parliament sat till 1689. This circumstance made an exception to the rule, which seems not to have been departed from in any other case till the late practice was introduced. 8 B. P. C. 2, 6. In 1686, during that long intermission of parliament, the chancellor, in the case of Barbon v. Searle, permitted a bill of review to be filed, after a decree of dismission had been affirmed in the house of lords, on the ground that the lords were not then in session to give directions; and if they were, yet as answers to petitions to them were not on oath, and the house had referred the cause back to be reheard as to one of the parties, the chancellor conceived that defendant ought to answer so as to enable the plaintiff to make application to the lords; the demurrer was overruled, defendant or-

dered to answer, but the plaintiff was not to proceed any further without the special order of the court. The plaintiff's counsel did not pretend that the court could alter or reverse the order of the house, but put the case on the same ground as the chancellor, alleging, as their reasons, that as the house could not act in the interval, there was a necessity for the action of the chancellor, or the party by death or otherwise might lose the benefit of the bill. 1 Vern. 416, 418. Vide 1 Johns. Ch. 196. In a prior case the defendant was decreed to answer a bill of review or demur on the errors assigned after the dismission of an appeal to the house of lords; but it was on an allegation that the cause was carried by collusion without defense, and the benefit of the order of dismission was saved to the defendant. Finch, 468, 469. This seems to be the utmost extent to which any court of equity have gone after an appeal; when they have gone further and attempted to review or reverse what had been done in the house of lords, the latter have asserted their powers as an appellate court.

In the case before referred to, of Popham v. Bampfield, a bill of review had been filed in chancery, after a decision on appeal; on a petition to the lords, suggesting that court had proceeded to examine into an order made by them for the purpose of reversing it, the party and his solicitors were ordered to attend the house. 15 Journal House of Lords, 328. A committee was appointed to report what ought to be done (Id. 330), who reported that, as the chancellor had not proceeded on the bill of review, nothing need be done by the house (Id. 332, 8 B. C. 3). After this a petition was presented to the lords, praying directions by them to the court of chancery, to proceed on the bill of review. The petition was dismissed, "in regard, it appeared, that the motion therein complained of had been already settled by the house." 8 B. P. C. 8; 16 Journal House of Lords, 197. These cases show that, by the ancient practice, the court of chancery, in cases of necessity, might proceed, after an appeal from an interlocutory order, to settle an account before a master; that they might receive a bill of review after a decree of dismission in the house of lords, and act upon it by their special order; but that they viewed it as a contempt in the party and his counsel to examine their decree for the purpose of reversal by a bill of review in the court of chancery. This course seems to accord with the rules of equity, and to be particularly applicable to the judicial system of the United States. The equity powers of the supreme court, in ordinary cases, are exclusively appellate by the constitution; they cannot take cognizance of an original bill in equity for the want of jurisdiction; and as an appellate court cannot sustain an application for a bill of review (4 Desaus. Eq. 13, 14), or an appeal from an order of the circuit

court refusing it, as it is not a final decree, and no act of congress has extended their appellate power to such a case (1 Hen. & M. 557, 559; s. p. [Young v. Grundy] 6 Cranch [10 U. S.] 51; [Gibbons v. Ogden] 6 Wheat. [19 U. S.] 448), and as it is a matter of discretion.

A bill of revivor, a supplemental bill or bill of review, is an original bill, so far as it relates to the court in which it is filed, and any action upon it is by the original power of the court which gave the decree over its own proceedings; appellate power is exercised only over the proceedings of inferior courts, not on those of the appellate court. So, on the other hand, the inferior court, after the action of the appellate court, is bound by its decree as the law of the case, and must carry it into execution according to their mandate; they cannot vary it or examine it for any other purpose, or give any other or further relief. 1 Johns. Ch. 194, 196. They cannot sustain a bill of review on any matter finally decided on appeal (1 Hen. & M. 557, 558), or for error apparent in the decree of the appellate court (3 Munf. 228; Mitf. Eq. Pl. 69), or intermeddle with it further than to settle so much as had been remanded. 1 Johns. Ch. 196. The court of appeal decides on the whole case, and gives such decree as the court below ought to have made. Such is the acknowledged doctrine of courts of review (1 Johns. Ch. 194), and the express direction of the twenty-fourth section of the judiciary act (1 Story, Laws, 610 [1 Stat. 85]). And the supreme court remands the cause to the circuit, with a mandate to execute their decree. When this is done they will not grant a rehearing, and, on a subsequent appeal, nothing is brought up but the proceeding subsequent to the mandate. [Browder v. McArthur] 7 Wheat. [20 U. S.] 58; [Himely v. Rose], 5 Cranch [9 U. S.] 313; [The Santa Maria] 10 Wheat. [23 U. S.] 442. Whatever was before the court, and disposed of by its decree, is considered as finally disposed of. The house of lords never grant a rehearing. 3 Dow, P. C. 157.

The supreme court have no power to review their decisions, whether in a case at law or in equity; a final decree in chancery is as conclusive as a judgment at law. [Martin v. Hunter] 1 Wheat. [14 U S.] 355; [Hopkins v. Lee] 6 Wheat. [19 U. S.] 113, 116. Both are final as to the rights adjudicated upon. It is clear, therefore, that a circuit court cannot, on a bill of review, reverse a decree of the supreme court in a cause remanded to them for execution for error apparent, nor reverse their own decree during the pendency of an appeal, as that would be a direct interference with the power of the supreme court over a cause before them. If they should affirm the original decree, and remand the cause for execution, this court would be bound to obey the mandate; or on a simple affirmance would be equally obliged to execute it, notwithstanding their reversal on a bill of review. But they can do this,—

give leave to file the bill as an amendment, —by adding new matter and parties to the original record. After a writ of error is brought, the court below may amend the record by adding the charge of the court, which had been excepted to (12 Serg. & R. 13, 14), and many other cases where the justice of the case requires it. A court of equity is not less liberal in allowing amendments than courts of law; and we can see no reason why they should not be made during the pendency of an appeal as before, especially when we consider that the benefit of the new matter may be lost by time or accident, or the party may lose the bill of review by the equitable limitation as to time. [Thomas v. Harvie] 10 Wheat. [23 U. S.] 149. What will be done with it after the court have given leave to file it, is another question. Should the supreme court award an order or certiorari to return it to them, the circuit court must obey the order, and then it will be for the supreme court to act upon the new matter or not, as they shall think belongs to them as an appellate court. If not, then it remains in the circuit court, as a subject not acted upon in either court.

In an admiralty case, the supreme court have decided that after their mandate has been before the circuit court, on all proceedings to carry it into effect, the original proceedings are always before the court so far as they are necessary to determine any new points or rights in controversy between the parties, which were not terminated by the original decree. They may inspect them to ascertain the merits or demerits of the parties, so far as they bear on the new claim, and must decide upon the whole examination what their duty requires. [The Santa Maria] 10 Wheat. [23 U. S.] 442. Where an application was made to the circuit court to open a decree in an admiralty case, after an appeal to the supreme court, the learned judge of the first circuit refused it, but considered it competent to allow the new evidence to be placed upon the record with a memorandum that it was brought in after the appeal, and it was transmitted together with the record. The London Packet [Case No. 8,474.] In these cases the application of new parties to be permitted to make claim after an appeal must be made in the circuit court. [The Mary] 9 Cranch [13 U. S.] 142. And all amendments must be made there ([The Marianna Flora] 11 Wheat. [24 U. S.] 38), though that court may make amendments in cases before them on appeal from the district court. In a common-law case it has been decided that after an affirmance of a judgment of the supreme court of New York by the court of errors, and their judgment affirmed in the supreme court of the United States, that a writ of error coram vobis will lie to reverse the original judgment for an error in fact. Packard v. Davis, 8 Pet. [33 U. S.] 324. There is a strong analogy between proceedings in admiralty and

chancery, but still stronger between a writ of error coram vobis, and a bill of review on matters of fact not in the record; both proceedings are in the same court, and, if there is a reversal, it is for error in fact. In the case of Packard v. Davis [supra] the fact of alleged error was that Davis was a consul, not suable in a state court, which did not appear in the record, but he is allowed to state it in his writ of error coram vobis, for the purpose of reversing the judgment. So here, the error in fact alleged is that the court decreed John Aspden of Lancashire to have been the heir at law of the testator, whereas, the petitioners allege that John Aspden of London was the heir at law; and they ask for leave to file their bill of review, to enable them to prove this fact, and on that ground to reverse the decree. We have, therefore, no doubt that we have cognizance of a bill of review after an appeal, if it is brought on newly-discovered evidence of facts; but not if it is for error apparent in the body of the decree. The whole case is now in the supreme court, on the law and the facts; they may affirm, or reverse in whole or in part, and, after rendering such decree as we ought to have done, will direct their mandate to us for its execution, which we must obey; we cannot alter, review, revise, reverse, or explain it, for any errors, however apparent, except miscasting or clerical mistakes. It will be time enough to decide whether we can reverse it for error in fact on the bill now offered, when it shall be necessary; in the meantime, we feel at perfect liberty to allow it to be filed, if in other respects a proper case is made out.

The next subject of inquiry is whether the petitioners are entitled to a bill to review the decree rendered in the case of Packer v. Nixon. The rule is well settled that it lies only in favor of a party or privy to the original suit, as in a writ of error (Pr. Reg. 50; Bohun, Curs. Can. 383; 1 Har. Ch. 290; [Green v. Watkins] 6 Wheat. [19 U. S.] 263; 4 Hen. & M. 244; 4 Vin. Abr. 410; Mitf. Eq. Pl. 72), or those who are aggrieved by the decree. As the petitioners were not parties to the original suit, the only question is whether there was a privity between them and any of the parties, or whether they come within the description of persons aggrieved by the decree, who may have a bill of review to revise and reverse it. Privity is fourfold: 1. Of estate, as donor or donee, lessor or lessee. 2. In blood, as heir to the ancestor, or between coparcenors. 3. In representation, as executors, &c., to the testator. 4. In tenure, as the lord and tenant, which may be reduced to two general heads, privies in deed, and privies in law. Co. Litt. 271a; Slack v. Walcott [Case No. 12,932]. Privity of title is where a party dies whose interest is transmitted to some other person, who succeeds by law to the title of the deceased; if he claims by purchase or devise, he introduces a new title not before the case; the privity must be by representation, as heir in relation to the real estate, and executors and administrators to the personal. Slack v. Walcott [supra]; Gilb. Forum Rom. 172, 186; 2 Har. Ch. 123. A devisee is not in privity with the testator, nor is an assignee or vendee in by privity (1 Ch. Cas. 123; 1 Eq. Cas. Abr. 164, pl. 3; Pr. Reg. 50; Bohun, Cars. Can. 383; 1 Ch. Cas. 174; Coop. 43, 44; Toth. 173; 1 Vin. Abr. 426; Slack v. Walcott [supra]) with the assignor. So in cases of bankruptcy the assignor cannot revive a decree in favor of the bankrupt, and in this respect the rule is the same in bills of revivor as of review (1 Atk. 88, 89; Comyn, 590), for privity of title is not enough, it must be privity of title derived by the act of the law. Slack v. Walcott [supra]. As to parties the rule is so strict that a bill of review lies not in favor of one in whose favor a decree is rendered for less than he claims (2 Freem. 182, 183; 4 Ch. R. 99, 100; Bohun, Curs. Can. 387; 2 Har. Cas. 127; 1 Ch. Cas. 53, contra, but by mistake in "overruled" instead of "allowed" in s. c.), it lies only in favor of him against whom the decree is rendered or whose bill is dismissed (2 Freem. 183; 2 Eq. Cas. Abr. 174). And when the heir of the mortgagee brought a bill against the mortgageor for foreclosure and obtained a decree, on a will being discovered which gave the mortgage money to the executor, the mortgageor exhibited his bill of review to be relieved against the decree, and praying the court to direct to whom the money should be paid, the court would not make the executor a party, but left him at liberty to sue the mortgageor on the mortgage covenant. 4 Ch. R. 52, 54; 2 Freem. 148, 149; 3 Ch. R. 94; 2 Eq. Cas. Abr. 173, 174.

In the present case the petitioners, as devisees, are in privity neither with the parties or the testator; they do not claim by representation, succession, or act of law, but as purchasers under the will, in which capacity they must take, if at all, as we decide in the original case. Had they been purchasers from any of the parties, they would not have been their privies in deed or in law. Their claim is adverse to all the parties in the cause, and, not coming in by any privity, cannot sustain a bill of review. It is unnecessary to examine the cases in which remainder-men, or others whose interest is affected by a decree to which they are not parties, may have a remedy in a court of equity; it is enough for this case that none but parties or privies are entitled to a bill of review, and that the petitioners appear before us in neither character. If they do not come within that class of persons who are aggrieved by the decree, their petition cannot be received. There is but one case of this description to be found in the books. A vicar sued the parish for tithes; four of the parishioners were appointed to defend the suit; a decree passed against the four, and all the miners in the parish. Vide 2 Vern. 184; 1 Eq. Cas. Abr. 163. The court said that one of the miners,

not one of the four, though not party or privy, might have a bill of review, because he is grieved by the decree. 1 Ch. Cas. 272; Pr. Reg. 50. It is obvious that this case cannot aid the petitioners; it was a peculiar one which requires no farther elucidation than to state it. Were we to consider this general expression, "persons grieved," as applying to all persons whose interest may be affected by a decree, we must extend it to devisees, purchasers, and assignees, in opposition to weight of authority which judicial power is incompetent to remove or shake.

On this ground, then, there is an insuperable objection to granting leave to file the bill now offered; we might stop here, but, as other important questions necessarily arise on the case, it is proper to decide them, as the merits depend as much on one view as another.

The objection taken to the affidavit is, we think, unanswerable. The one annexed to the petition by one of the solicitors, and to the bill by the agent of the petitioners, is in the common form of affidavits to original bills, which require the verification of the complainant; they want both form and substance, as neither of them contains the necessary averment which a party is bound to make. Neither does the supplemental affidavit of the two solicitors remove the difficulty. It presents this case: That about the 3d of June last they were retained in this cause, and in a few days afterwards discovered the new matter now set up for a bill of review; the petition was presented immediately containing an averment that neither the petitioners nor their agent, at the date of the decree, knew of the existence of the matter thus discovered, "and that it could not have been made use of by them in any way at the said hearing or before said decree." Now, there is no direct affidavit of this averment, even by reference to the petition or bill; the forms require it to be in the body of the affidavit; admitting that under the circumstances of this case, petitioners residing in London, and their agent here being a merchant, the affidavit of the solicitor might be taken as to the fact of discovery, it cannot be as to the all-important fact "that the matter could not have been used before the decree." It matters not that it was not known; if it could have been known and used by the exercise of a reasonable degree of active diligence at any time before the decree, it is a conclusive answer to the petition. How stands the case in this respect? The petitioners retain no solicitor till near six months after the decree; by the affidavit of Mr. Broom, it appears that in March, 1831, he communicated to Mr. Brown the pendency of the suit of Packer v. Nixon, its subject-matter, nature, and the parties respectively who claimed the estate of Mr. Aspden. The bill of review shows that from 1825 till 1830 a suit was depending in the court of chancery in England against the same defendant for the same subject-matter

to which the petitioners were parties by a bill of revivor, which was dismissed. as they are informed and believe, upon an opinion that the personal property was distributable according to the laws of the United States; after which they brought another suit on the equity side of the court of exchequer, which was dismissed in 1831. After this active pursuit of the fund and the executor in the courts in England for six years, and with the knowledge that it was here in his hands for distribution, they make no claim, employ no counsel, or make any movement in the assertion of their rights till the summer of 1833, when they, as the bill alleges, gave some instructions to Mr. Bowen, which are not produced. When petitioners thus circumstanced appear in a court of equity and ask for leave to file a bill of review on new matter discovered in the possession of the executor, on the first search they had ever made, or authorized to be made, and that ten years after the death of the testator, it presents a case of the most gross and palpable negligence, while it remains unaccounted for. In such a case, we should require not only the strong affidavit which is necessary in all cases, but the strongest one which would be necessary from any petitioners, their solicitors, attorneys, and agents employed to conduct the suit in England, as well as their agent here. There must be a direct appeal to the conscience of all, by a searching, drastic affidavit, which should purge them all of such negligence. Yet from England we have not one word, from party, solicitor, country attorney, or law agent, though an affidavit on another matter has been taken in London since the pendency and knowledge of this petition. No person employed in the suits from 1825 to 1831 has given us his oath on any subject. A witness has been called from Lancashire to London to verify the parish registers for the purpose of showing the pedigree of the petitioners. His affidavit shows very active diligence in searching the registers as early as 24th July last, but it also shows that they were found where they ought to be, and where they were known to be,—that is, in the places where the persons lived and died; as that of the solicitors does, that the papers of the testator were found in his trunk in the hands of his executor; and both, so far from removing the imputation of negligence, confirm it most conclusively, in the absence of any affidavit by other persons.

Being satisfied that the evidence now discovered could, by the exercise of ordinary diligence, have been procured and used before the decree, we must refuse leave to file the bill on this ground, if it was the only one, and we must not be understood as deciding this point on the particular circumstances of this case alone. The common affidavits to original bills cannot be received on petitions for bills of review; they must be in the usual form, and contain the averment, not only of the party, but of all other per-

sons whose negligence may be imputable to the petitioners, that they could not possibly have used the evidence at the hearing, or before the decree. This is not merely form, but the very essence and substance of the application for review; no decree can be opened upon the mere fact of discovery, if there has been negligence in making the proper search; when a party has it in his power to remove the imputation, and does not do it, especially in a case like this, every presumption is against him.

It must, therefore, be understood as our decided opinion that, to all petitions for bills of review, the affidavit must be made by the party making the application, unless it shall appear from special circumstances that the whole subject is so fully in the knowledge of some other person, and that he can satisfy the court on all matters upon which they are to act. The most responsible and solemn act of civil justice which any court can perform is the reversing their own deliberate judgments; it is the most dangerous, too, when it is done on the affidavit of a party on whose oath a fortune depends, and especially when the decree points him exactly to the proof he is to make or procure; yet, if by such oath he makes out a case, we are bound to open a decree, if there is nothing to throw suspicion over the application. The rules of equity have wisely provided, not only that the party shall make an oath, but that the court shall be satisfied as well of the fact that new matter has been discovered, as that it could not have been known and used before. Their first step is the all-important one, and, as it necessarily leads to a second, it then becomes irrevocable; the decree becomes open for examination in a new course of litigation; it will be interminable; our most solemn proceedings will be but shadows, if, before we revise them on the oath of a litigant party, he is not required on his part to comply with every condition imposed on him, as indispensable to any movement of the court. If he does not do his duty, we directly violate ours in granting him a dispensation not warranted by the law or usages of a court of equity. In this case, we are not satisfied with the case presented by the affidavits; on the other hand, we think that it would be difficult to support it by any affidavit, however strong.

This leads to a consideration of the application as it would stand on satisfactory affidavits. Among the exhibits in the case of Packer v. Nixon is a copy of the bill filed in chancery by John Aspden of London, the father of the petitioners, against Mr. Nixon, the executor. This bill is referred to in the bill of review now offered for our allowance, and is therefore judicially before us. This bill was filed in 1825, praying that the complainant might be declared the heir at law to the testator, and, as such, entitled to his whole personal estate, and praying for an injunction to the transmission of the estate to the executor. The will and accompanying codicils or memoranda were set out at length, with an averment that Mr. Nixon had proved it here and in England; had taken on himself its execution, and possessed himself of all the personal property of testator. He then avers himself to be the heir at law; and, as evidence thereof, shows that Thomas Aspden, of Simonstone, in Lancashire, was the common ancestor of the testator and himself, who had issue twelve children, the eldest of whom was John Aspden, who died and was buried at Deptford, in Kent, in 1754, leaving issue only one son, Andrew Aspden, who died and was buried in the same place in 1771, leaving issue the complainant, his only child and heir at law. That the testator was the only son of Matthias Aspden, the third son of Thomas, of Simonstone, the common ancestor; he also stated that at the time of filing the bill he was eighty-five years of age. After their father's death, the petitioners became parties to the suit by bill of revivor in 1828, and its averments thus became theirs; they also filed a bill as heirs at law of the testator in the exchequer in 1831. Such was the case of the father from 1825 to 1828, and of the petitioners from 1828 till 1831, in the courts of England. This is precisely their case as first presented in this court in 1834; there is no new matter now introduced as evidence of their title,—not one fact alleged which was not before substantially averred. From the first to the present moment, the whole case rests on pedigree; it was necessary to trace it to a time beyond the memory of living witnesses; there could be no evidence to prove it but the registers of births, marriages, deaths, and burials, traditions, hearsay, or the written recognition of relationship by the testator or other members of the family. Let it come from whatever source, it tended to but one point,— the common ancestry of the complainant and the testator, and a lawful succession from the elder brother, all of which was as fully known in 1825 as now. John Aspden was then eighty-five years old; born in 1740, he was fourteen years of age when his grandfather died, and thirty-one at the death of his father; he must have been familiar with the family pedigree for more than half a century, after he came to man's estate. and when he was seeking a large fortune by an adversary suit, must have been aware of the necessity of proving his case; on what subject did he want knowledge? Pedigree; it was easily attainable at the places where he was bound first to look,—the registers; and the testator's papers would show it; if he did not examine them, there is gross negligence, in which case he is presumed to know all that he might have known with reasonable diligence. 16 Ves. 353. But it is needless to resort to presumption in such a case as this; it is neither possible nor credible that the counsel or solicitors in England would prosecute a suit by an heir at law whose succession was to be traced back one hundred and thirty-six years. without examining the registers; or that, if the search had been made without ef-

fect, they would not have advised the present petitioners to give some account of it. The deposition of Mr. Neville, with the accompanying copies of the registers, shows the facility with which they were obtained; those from Padeham and Whatley are dated on the 24th July, the same day on which Mr. Neville states he went there for the purpose; the others were obtained between the 4th and 8th of August, and the affidavit taken on the 9th, being only fifty-three days from filing the present petition.

There is no averment in the bill, petition, or in any other way, that all this evidence was not in possession of the parties from 1825; the counsel in their arguments have not pretended it; they surely cannot expect the court to presume it. The facts attested by the registers, therefore, cannot be deemed new matter.

This brings us to the consideration of the testator's memoranda on the two separate papers found in his trunk, with the entries in his Bible; and, as we should probably have permitted the petition to be amended so as to introduce the canceled wills of the testator, it may not be improper to refer to them, to avoid a future application. These memoranda are good evidence of pedigree, as the deliberate declarations of the testator, and tend strongly to prove the fact that his grandfather, Thomas, had twelve children, of whom John was the eldest; this is the very fact stated in the bill of 1825, and of course has not been newly discovered. These memoranda also note the baptism of several of the children, with their places of burial, but none of them take notice of the descendants of any, except Matthias, the father of the testator; so far as they relate to the baptism and burial, they correspond with the registers proved by Mr. Neville's affidavit, and thus far disclose no matter which the registers do not contain. They are not new in fact, or to the knowledge of the petitioners or their father, if they or either of them knew of the registers before; they cannot be deemed by the court to be new if the registers were known to their counsel, solicitors, attorneys or agent, for knowledge by either of them is knowledge by the parties; nor is the matter deemed new in law, if by reasonable diligence either might have known of it in time to use it before the decree. 3 Atk. 36; 4 Browne, Parl. Cas. 483, 484; Dexter v. Arnold [Case No. 3,856]. As facts, therefore, we cannot consider them as new matter, they can only be considered as new evidence of facts known since 1825. There are some other facts referred to in these memoranda, but it is necessary to inquire only into their materiality hereafter. The canceled wills are evidence not only of the intention of the testator at the time of making them (8 Serg. & R. 579; Seaton v. Kuhn, C. C.), but as the recognition of a kinsman or relation, and that there was a person in the family of the name of T. J., an elder of the brother of the William from whom the lessor claimed (11 East, 504, 506). In the will of 1776, a legacy of £100 is given "to my cousin John Aspden of London"; in that of March, 1791, he gives "to my second cousin John Aspden, living in Old street, London, £10, and to his two daughters the sum of £2 each": this recognition of the testator is good evidence of the relationship of both the father and the present petitioners, but it is no newly-discovered fact. In 1825 John Aspden knew that the testator was the grandson of Thomas of Simonstone, and that he was his great-grandson; of necessity, then, they were cousins in fact, and so deemed in law: and nothing more is now discovered except the fact that the petitioners are the daughters of John.

The new discovery being then exclusively of the evidence of well-known facts, we proceed to inquire whether it is of that nature as suffices to open a decree, as also whether it is so relevant and material as if used before the decree would probably have produced a different result. The order of Lord Bacon, allowing bills of review, is in its terms and its uniform construction applicable only to two cases,—error in law in the body of the decree without farther examination of fact; the error must be apparent in the decree itself. Toth. Append, 41; 2 Ch. Cas. 153; Prec. Ch. 260; 1 Eq. Cas. Abr. 81; 4 Vin. Abr. 414, pl. 12. It is in the nature of a writ of error (4 Vin. Abr. 407), and lies for want or excess of jurisdiction (1 Vin. Abr. 292; 2 Har. Ch. 123, 127), or an error in conscience on a matter proved (4 Vin. Abr. 408; 1 Rolle, Abr. 382). The error must appear on the case as stated in the decree, and every fact must be admitted as stated. 2 Har. Ch. 124; Bohun. Curs. Can. 381, 386; 2 Eq. Cas. Abr. 174; 2 Freem. 182; 4 Vin. Abr. 407, 408; 1 Ch. Cas. 54, 55, 105; Hardin, 174. The decree is matter of record, and can be tried only by the record. Pr. Reg. in Chancery, 51. If there is a mistake of fact, it must be corrected on an appeal (2 Freem. 182; 1 Eq. Cas. Abr. 164; Lane, 68, 69), or the decree is final (4 Vin. Abr. 407; 1 Ch. Cas. 231, 233; Bohun, Curs. Can. 385, 386). And it is no error that the matter decreed is contrary to the proof (1 Vern. 166), for after decree it is presumed the court judged on the whole proof according to its purpose (Hardin, 174). Witnesses cannot be re-examined anew. 4 Vin. Abr. 407; 2 Freem. 181; 1 Eq. Cas. Abr. 81; Dickens, 614; 2 Madd. 536, etc.; Dexter v. Arnold [supra], full on these points. These bills are not favored, and a second will not be allowed, however manifest the error. 2 Ch. Cas. 133; 2 Madd. 541. And if a fact is omitted to be stated that is matter of appeal. 4 Vin. Abr. 408; 2 Keb. 279, pl. 46; Dexter v. Arnold [supra].

After a decree the proofs are no more to be questioned than the verdict of a jury on a writ of error. Hardin, 51, 127. Nor is a master's report confirmed on exceptions; it is as conclusive as a verdict. [Hopkins v. Lee] 6 Wheat. [19 U. S.] 113, 116. Error apparent does not apply to an erroneous judgment merely, and the question is not whether the cause is well decided, but whether the de-

cree is right or wrong on the face of it, as an infant not having a day allowed him, &c. (17 Ves. 178), a decree taken pro confesso, where the party was not brought in contempt (4 Ch. R. 64, 66), or the decree is contrary to a statute (4 Vin. Abr. 407; 1 Rolle, Abr. 382), or for decreeing a sale under the authority of a law without complying with its provisions ([Bank of U. S. v. Ritchie] 8 Pet. [33 U. S.] 145); not for any errors in the progress of a cause, or a master's report excepted to, because not in the body of the decree (2 Eq. Cas. Abr. 175, pl. 12; 4 Vin. Abr. 414, pl. 6; 8 B. P. C. 391, 392). But if part is repugnant to another (Bohun. Curs. Can. 381), or the decree impossible (1 Ch. Cas. 86), it lies. So if the decree is founded on a record made in a case depending in chancery, which was referred by the solicitor in the cause without the consent of the party. 1 Ch. Cas. 85, 86. But, to make a decree conclusive as to the facts, it must appear that the court rendered their judgment upon them as "on reading the proofs, it appeared." If it is on reading the proofs, it is decreed that is no decree on the evidence. 2 Ch. Cas. 161, 162; Bohun, Curs. Can. 388.

The new matter to sustain a bill of review must have risen in time since the decree (3 Atk. 627); and not any new proof which might have been used when the decree was made, unless it has come to light since, and could not possibly have been used, at the time of the decree (Toth. Append. 41). New matter means a fact in esse at the time of the decree, not then in the knowledge of the party, his solicitor or agent (2 Atk. 534; Dickens, 612, 614; 2 Atk. 178), not where a matter of fact was in issue at the hearing; though new proof of it is discovered since, it will not be admitted (2 Freem. 31; 4 C. R. 196; 3 P. Wms. 371; 4 Vin. Abr. 414; 2 Eq. Cas. Abr. 175, 176; 2 C. R. 45; Dexter v. Arnold [supra]). If the bill contain matter, part of which was in a former bill and decree, and part new or by a supplemental bill, the court will, on a demurrer to so much as was contained in the former bill, direct the master to see what was in the former bill, and allow the demurrer accordingly (Gilb. Eq. 183, 184), to what was in the former bill. No witnesses who were or might have been examined on the former bill shall be examined to any matter on a bill of review (Bohun, Curs. Can. 381; 2 Madd. 518; Pr. Reg. 53); as where "plaintiff would examine as to a matter of tender and refusal, which he could not prove before the hearing, but could now prove it, no precedents could be produced, and the bill was dismissed" (2 Ch. R. 66).

Nothing is a ground to direct a new trial at law that would not be a ground for a bill of review to reverse a decree. 1 Ch. Cas. 43; 2 Har. Ch. 125. Nor is the want of any evidence or matter which might have been used in the first cause, of which the party then had knowledge and there is no proof, but the plaintiff might have had the witnesses that were examined here at the trial; though the proof

on the bill of review was such that the plaintiff in the original cause could not have recovered; it being his own confession, the court would not enjoin the judgment at law, and declared that a confession after a decree was no ground for a bill of review (1 Ch. Cas. 43, 44); or where the new evidence is not applicable to the original issue, nor where the original bill contained information on which he was required with reasonable diligence to try the case at first, on his whole evidence, and where the relief might have been effectually asked (16 Ves. 350, 354; Dexter v. Arnold [supra]). New evidence cannot be received on a bill of review in support of a case not in the record (16 Ves. 354; Amb. 293; 5 Mass. 313, 314); or to draw in question matters which have been settled on an account before the master, or put to an issue (2 Browne, Parl. Cas. 109; 2 Atk. 534). If a paper is produced by an adversary, it is the same as if produced by the party, and is not deemed new matter on a bill of review. 3 Atk. 37. The new matter set up must not be merely accumulation. Id.; 3 Johns. Ch. 127. It must not be the same or similar evidence, or corroboration. 1 Hen. & M. 15. If the party had knowledge of the matter, but offered no proof of it at the hearing, it is not the subject of a bill of review. 2 Freem. 178; 3 Ch. R. 76, 77. The new matter must show the right of the party at the time of the decree, which was not then known to him (2 Ves. Sr. 576); not additional circumstances, merely confirming facts before proved (1 Hen. & M. 179, 200), or proof on the same points which were in issue, or any evidence in the knowledge of the party before the decree (Gilb. Forum Rom. 186; Dexter v. Arnold [supra]). The course of the court on bills of review is conclusive to show the kind of evidence which alone can be sustained. The first object is a reversal of the decree. While it remains closed there can be no revision or explanation of it, except misstating. Gilb. Forum Rom. 184. On the plea by the defendant of the decree, and a demurrer to the new matter set up for opening it, as insufficient in law, the court decide whether there is a case for review. Gilb. Forum Rom. 189. In this stage of the cause nothing is read but what appears on the face of the decree, but after the demurrer is overruled the plaintiff is at liberty to read the bill and answer, or any other evidence, as at a rehearing, the cause being now equally open. 1 Atk. 290; Dexter v. Arnold. Defendant may, on a plea, disprove the new matter. 2 Madd. 543; Mitf. Eq. Pl. 236. But if he demurs, it is then too late to show that there is no new matter discovered, as it cannot be insisted on at that hearing. 2 Atk. 40; 3 Atk. 217. The court will not reverse a decree for any error not specially assigned in the bill or petition. Mitf. Eq. Pl. 70, 72; Dexter v. Arnold. If the decree is reversed, on a rehearing the cause is entirely open to the party in whose favor the decree is. As to the other, it is only open as to the facts complained of. If it is on new

proof, no other can be heard. 2 Madd. 483. There can be no new evidence on the merits (6 Johns. Ch. 256; 1 P. Wms. 300; 2 Vern. 463; 2 Har. Ch. 85), without special leave of the court, which is seldom granted (Gilb. Forum Rom. 183). These cases are evidence duly taken and omitted to be read; evidence of new matter not before ready; papers since found and allowed to be proved viva voce, or to impeach a witness before examined. 6 Johns. Ch. 256; Prec. Ch. 64; 10 Ves. 236; 13 Ves. 458; 1 Ves. & B. 153, 154. New evidence is not heard in the house of lords on appeal (2 Bl. Comm. 455; Gilb. Eq. 156; Amb. 90, 91), though it may be by the chancellor on appeal from the rolls (Prec. Ch. 496; 2 Atk. 408; 2 Vern. 463; Gilb. Eq. 151), it being in the nature of a rehearing. But the relation between these officers is peculiar, and the practice on such appeals is no guide to the course of equity, in cases where the rehearing is by the same court which gave the original decree, or to the proceedings in the courts of the United States on appeal. On a rehearing of a decree after the reversal on bill of review, the party must rely on the new matter in his bill, or the evidence already in the cause; he can introduce nothing which he had not assigned as a ground for opening the decree.

The court will not reverse a decree for extraneous matter arising in the progress of a cause not in the decree. Finch, 36, 209; 2 Atk. 534; 3 Atk. 627; 1 Vern. 392; 4 Hen. & M. 243, 244. The new matter must be such as will bear on the body of the decree, not on interlocutory orders. As the verdict of a jury cannot be revised on a writ of error, neither can the report of a master to which exceptions have been filed after confirmation, as it has all the legal effect of a verdict of the judgment.

The error assigned in this case is an error in fact, in declaring John Aspden of Lancashire to be the heir at law of the testator; if the decree is reversed, it must be on this ground alone; the other grounds taken in the petition are merely introductory to this. The only ground assumed by the petitioners is that they are the heirs at law, in which character they claim the fund in the hands of the executor, and this is the only fact on which they rest their case. They are not parties to the original suit; their title is nowhere set up, or appears in any part of the proceedings; it was not in the case or at issue in any way. John Aspden of Lancashire claimed in his own right by descent from William, the alleged eldest uncle of the testator on the father's side; he established his claim by competent evidence, without the least reference to there having been an uncle older than William.

We have, then, to decide upon a new case, by a new party, on a new title, no fact of which appeared before the final decree. The first question is whether an entire new title in a new party who is a stranger to the suit, claiming adversely to all the original parties, can be considered newly-discovered matter, for the opening of a decree. On this subject we have no doubt. There is not only no precedent for a new trial at law, or review in equity, in such a case, but it is opposed to the whole course of adjudication, in all courts, from the date of Lord Bacon's ordinances. If we take a narrower view of the case, the matter set up is only corroborative and confirmatory of the registers. The petitioners do not pretend that the fact of their heirship is matter come to light since the decree passed, or that the evidence of it by the registers has been newly discovered, or could not have been used at the hearing. They rest their bill of review solely on the memoranda and other papers of the testator, discovered in June last. Copies of these registers, duly attested or certified, are good evidence of all matters of pedigree. [Same Cause] 1 Dall. [1 U. S.] 2; Serg. & R. 389; 1 Yeates, 17, 15. They are the records of facts, beyond the memory of man, entitled to great weight; they are alone sufficient to establish pedigree of a much higher character than hearsay, which is also admissible.

As to distant facts, they are the primary and principal evidence, not to be lightly questioned. The contemporaneous memoranda of a member of the family, made from his own knowledge, may, in some cases, be as good or better evidence; or family records and muniments of title. But that is not this case; these memoranda refer to events before the testator was born; the last one was more than a century after the birth of his uncle John; his knowledge must, therefore, have been derived from hearsay, family papers and entries, or from the registers. In this case the registers must be considered as the primary and most authentic evidence, and the memoranda secondary or auxiliary; but view them in either way, they are only additional to the registers, if they had been produced before the decree tending to prove the same fact. Now, as it is clear that the family pedigree was known from 1825, and that the evidence of it by the registers could have been used at the hearing, the petitioners cannot be now put in a better situation than if they had been parties and had produced the registers; in which case the memoranda and canceled wills would have been confessedly mere accumulation. The delay of their application to become parties certainly gives them no better claims to the interference of a court of equity than if they had made it after they knew of the dismission of their bill, and that the injunction which prevented the transmission of the fund here to be distributed according to the law of this country had been dissolved. There is no principle or rule of equity in relation to this subject that we should not violate, by now permitting the registers to be used as a ground

for opening the decree; they cannot be used in an appellate court, nor could they be used at a rehearing if the decree was opened. It would be giving to the memoranda the effect of an "acetiam" or "quo minus" clause in a writ,—mere inducement to introduce inadmissible yet indispensable evidence, that would make bills of review matters of course; for the party would only be obliged to show some item of evidence connected with or forming a part of his title, which was newly discovered; then he could, by its potency, introduce an entire new case and title, and all other evidence, however long he had known of it, and however convenient it might have been to produce it before. The effect of the registers may be very powerful to show how good a case the petitioners had, and how easy it was to have established it by the most ordinary attention; but they also show that a good cause may be lost by negligence, and, when that negligence has been palpable and long continued, any hardship that awaits them is not the fault of the law. If they had a title or right to this estate, they had a remedy which they could lose only by their negligence; they knew the fund was here, and a small portion of the time and money expended in England in litigation would have sufficed long since to establish it here. No principle is more approved, both in courts of law and equity, than that the best right may be lost by negligence. It is necessary to the peace of society and the security of titles.

It remains to take a still closer view of these memoranda and canceled wills, their relevancy and materiality, in producing a different result in the original cause. The entry in the Bible and on the two papers produced are evidence of one fact,—that John Aspden was the eldest son of Thomas of Simonstone, and, as such, the stock from which the petitioners must trace their descent; the memoranda as to the other children of Thomas have no bearing on the case, as they relate only to the place or time of their burial; the succession from John is not brought down; his death, burial, and place and time, only are noted; this leaves a long chasm between him and the petitioners, as to which the memoranda or entry in the Bible gives no information. It shows that William, the ancestor of John of Lancashire, was not the eldest son of Thomas; but not that John of London was the grandson of John of Kent, the son of Thomas of Simonstone. The canceled wills show that John of London was the cousin or second cousin of Matthias, the testator, and that the petitioners are the daughters of this John, but not that John was a cousin by descent from John, the eldest son of Thomas; he is equally a cousin by descent from any of his children. The indispensable link to complete the chain is wanting: there is no evidence to prove the descent from John; the

law cannot presume that John of London was his descendant, rather than of any other son; the fact must be made out in some other way than by the entry, memoranda, or canceled wills. Had they all been produced previous to the decree, they would not have authorized the court to declare that John of London was the heir. In our opinion on the exceptions to the master's report, we pointed out the course we should have pursued, but no notice was given that there was or would be any contest between two adversary claimants to the heirship on the father's side. Now, the newly-found evidence leaves a fatal chasm in the title of the petitioners; if we reverse the decree we cannot declare the petitioners heirs at law on the new matter set up; it may induce us to doubt whether John of Lancashire is the heir at law,—to believe that he is not; but, then, for what shall we reverse the decree, or permit it to be opened to receive evidence that does not make out the petitioners' case? If we do, then we must admit the registers, or proof by tradition, hearsay, or some other source not now pointed out. We cannot act upon the registers without making law to suit the case, and overturning every rule and principle which has been consecrated by courts of equity for two hundred years; we can act on no other evidence than that now set up without a second bill of review to let in new evidence from other sources than the register, or the papers now produced. If we could receive a second bill, we could act on nothing now before us; the consequence is that the petitioners have neither made out a case where they can be relieved by bill of review, or assigned any cause for review in the new matter set up.

The defendants have objected to the allowance of this bill on the ground that the proceedings in the court of chancery and exchequer in England, before referred to, are final and conclusive between the parties to those suits, and operate as a bar to any resort to the estate of the testator by the petitioners. If it were necessary to decide this question, we might not find it one of much difficulty; but it arises only collaterally on a preliminary proceeding resting in the discretion of the court, on which there can be no appeal, and, as we cannot grant leave to file the bill of review, it is unnecessary to decide it. Had the bill been filed, it would have been a proper matter to plead in bar, or to have set out as a ground of demurrer, or it may be pleaded to an original bill; in either case the decision of this court would be subject to an appeal; we therefore decline giving any opinion on this point.

There is another circumstance in this case which has not been noticed by the counsel on either side, and to which we advert only for the purpose of not being misunderstood in passing it without observation. The petitioners are certainly in time in making

their application for the bill of review in less than six months from the final decree. But the effect of time is important in other respects than as a mere legal limitation to the assertion of a claim in a court of equity; it has been before us on more than one occasion; we have expressed ourselves plainly and at length on the subject, and must not be understood as entertaining any doubts of the correctness of former opinions; whether they would apply to this case is another matter.

We have felt it our duty to give this case our fullest consideration; it has enabled us to come to a conclusion perfectly satisfactory to our own minds; we should have been better pleased if a case had been presented to us which would have authorized the opening of our former decree. It is highly desirable that justice should be so administered that no right should be without a remedy, especially in a court of equity. Yet no administration of justice can be so dangerous, as affording remedies in violation of the settled law of the land; the peace of society and the security of the rights of property are better preserved by leaving parties to suits to the effects of their own negligence, than disturbing the sanctity of judicial proceedings for light causes. It is for the interest of the public that there should be some end of suits, and the law aids the vigilant, not the negligent. The petition is dismissed.

[See Case No. 10,653 for opinion of circuit court in the case of Packer v. Nixon.]